Opinion issued February 5, 2015



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-01030-CV

———————————

**MARIBEL IMAMOVIC, Appellant**

**V.**

**ROBERT MILSTEAD AND TEXFORD BATTERY COMPANY, INC.,**
**Appellees**

On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2012-46761

## MEMORANDUM OPINION

This is a car-wreck case. Appellant Miribel Imamovic appeals the trial court's judgment, entered on the jury's verdict, awarding her zero damages. We affirm.

## BACKGROUND

Appellee Robert Milstead,[1] while driving a truck owned by appellee Texford Battery Company Inc., rear-ended the Toyota Prius Imamovic was driving. Appellees admitted fault, and trial was held only on the issue of personal-injury damages. Imamovic argues that the jury's awarding zero damages was against the great weight of the evidence and manifestly unjust. Accordingly, she requests that we reverse and remand for a new trial.

### A. Trial Testimony

*Maribel Imamovic*

Imamovic was 42 years old at the time of the 2013 trial. She works as a vehicle-for-hire inspector for the City of Houston in its Administration Regulatory Affairs Department. In this position, she travels around Houston to inspect vehicles like taxicabs, limos, and private school buses. She testified that she was stopped in her City-owned Toyota Prius at a red light on July 5, 2011, when she was struck from behind. She testified that the force made her "want[] to black out" and "overwhelmed." The police report was admitted into evidence and stated the investigator's conclusion that Milstead and Imamovic were both stopped at the red light before Milstead moved forward and struck the back of Imamovic's car.

---

[1] Robert Milstead died before trial, and his son Robert John Milstead was substituted as heir.

Imamovic told the police officers that responded that she did not need medical treatment, and she drove the Prius from the scene. She testified, however, that the following day she starting feeling sore and that her neck pain was unbearable by the third day. It constantly felt like sharp needles were stabbing her neck.

Imamovic made an appointment at Kelsey-Seybold, which is her primary medical provider. Her regular doctor, Dr. Kelly Cajahuaringa, was not available, so she instead saw Dr. Xavier Castillo on July 7, 2011. She was unimpressed with Castillo, as he did not appear concerned. He prescribed her anti-inflammatory and pain medications and—at Imamovic's request—ordered x-rays. According to Imamovic, Castillo also ordered physical therapy for her, although there is no reference to that in Castillo's notes. Castillo's notes from his July 7 appointment reflect that he "placed her on light transitional duty" and asked her to make a follow-up appointment within two weeks. She testified that she went to physical therapy at Focus Physical Therapy after her first visit with Castillo, but did not return to work. Imamovic instead waited almost two months before returning to see Castillo on August 31, 2011. She first testified did not return to the doctor before then because she had plenty of pain medication and did not believe that Castillo would do anything helpful for her. She later testified that she did not

3

return earlier because she did not control when Kelsey Seybold scheduled appointments.

Imamovic also testified that, at the August 31, 2011 follow-up appointment with Castillo, she asked for a release to return to work because she was concerned that the City was laying off employees and did not want her employment to be adversely impacted by her being out with an injury. Castillo's notes from that follow-up appointment state that Imamovic told him that "she has an attorney for her worker's comp case" and that an outside doctor had referred her to physical therapy. Castillo's records also reflected that he told Imamovic that she had a "soft tissue injury" and "degenerative arthritis" in her neck.

Her physical therapy records also show that her physical therapy had ended by August 31, 2011, but that a Dr. Roberts, who works at Focus Physical Therapy, had referred her for an MRI at Memorial MRI, which Imamovic testified was because she was still complaining about neck pain.

In September 2011, Imamovic was in another wreck in which she rear-ended another vehicle. She testified that was a minor accident in which she was not injured.

Imamovic testified that, in January 2012, a co-worker recommend that she see a Dr. Berliner. "New patient" forms she filled out at Dr. Berliner's office, however, were dated November 2011. Although she testified that she was still in

4

pain and taking painkillers and muscle relaxers when she went to see Berliner, the intake paperwork she filled out for her first visit with Berliner reflected that she was not taking any medications. She testified at trial that was because she did not remember the names of any of the medication she was taking. Berliner's records reflected that Imamovic did not tell Berliner about the September 2011 wreck and that she specifically denied suffering any injuries prior to the July 2011 accident.

Contrary to what she told Berliner, Imamovic testified at trial to having suffered a previous lost-time on-the-job fall and a previous rollerskating injury. And, although she testified to never having previously had shoulder pain, medical records were introduced at trial showing that, in 2009, x-rays were ordered of her shoulders based upon her complaint about severe pain in both shoulders. Medical records also reflected that, when she was injured on the job in March 2011, she took several weeks off work and made a workers' compensation claim complaining of lower back pain and her arm tingling.

Imamovic testified to being much more impressed with Berliner than Castillo, as Berliner seemed to listen to her and be very knowledgeable. She testified that Berliner looked over her MRI results and told her that she has bulging discs in her back that put pressure on her spinal cord. Berliner treated her with an epidural steroid injection, but that did not help her pain. She has the option to have surgery to have two disc in her neck fused. She first testified that she had not yet

5

had the surgery because the defendants refused to pay for it. On cross-examination, she conceded that she could have filed for workers' compensation or used her private insurance for the surgery. She did not avail herself of those options because she did not think the City should have to pay for her surgery because the accident was not her fault.

Imamovic testified that she was still in significant pain at the time of trial. Her neck injury also makes daily driving with her job challenging, as she has to move her neck a lot. She had hoped to become a police officer and has passed the written exam, but her neck injury prevents her from being able to perform the physical examination part of the test. She also used to exercise regularly, which she cannot do any more.

On cross-examination, Imamovic agreed that she had a physical examination with her regular doctor, Dr. Cajhuaringa, two months before trial, and that she did not mention to Cajhuaringa that she had any neck or back pain, and did not list painkillers as medication that she was taking at the time of the physical. Medical records from that June 2013 examination were entered into evidence, which reflected that her neck was supple and had a normal range of motion.

On cross-examination, Imamovic also agreed that—although she testified that her back injury from the accident made her sad and depressed—she actually suffered from depression prior to the accident and had been on anti-depressant

6

medication for a number of years. She also clarified that although she testified essentially that she was unable to pass the law enforcement physical because of her back injuries, she actually stopped working out three years before the July 2011 accident. She also agreed that Berliner had never told her that she could not work out. She further testified on cross-examination that she had not done the other things necessary to applying for law enforcement jobs, including completing applications and registering for the required college classes.

### *Dr. Kenneth Berliner*

Dr. Berliner's deposition testimony was played at trial. He testified that he is a board-certified orthopedic surgeon. At Imamovic's first appointment with him in November 2011, she reported to him that her vehicle had been rear-ended by a truck in July 2011. Her airbags did not deploy, and her "head and torso were jerked in a forward-and-back motion causing intense pain." She told Berliner that her physical therapy had not given her relief, and that she had pain radiating into both arms and constant back pain. She also reported discomfort with side-to-side movement and pain radiating to the left leg with some numbness and tingling.

Through his examination and evaluation of Imamovic's MRI results, Berlinger diagnosed her with "disk protrusions at C5-6 and C6-7" and "some disk bulging at L4-5." He first recommended a cervical epidural steroid injection to decease inflammation and prescribed an oral anti-inflammatory medication, a

medication for muscle spasms, and a pain medication. In April 2012, Imamovic had the steroid injection performed, but on May 22, 2012, reported that she had constant pain in her neck, pain with movement, stiffness, pain radiating to both arms, back pain and stiffness, and occasional pain radiating into her right leg.

At her May 2012 appointment, Berliner recommended surgery; namely, a cervical discectomy and fusion. Berliner testified to his opinion that surgery would bring Imamovic significant lasting relief. He also testified to his opinion that the "surgery is medically necessary to help alleviate her symptoms that arise from the disk protrusion and herniations at C5-6 and C6-7." He further opined that she would have a "permanent physical impairment" from the procedure, in that she would lose some range of motion in her neck and back. He estimated these as 28% to 29% "whole person impairment."

### Dr. Stuart Weil

The appellees introduced the deposition testimony of their neurosurgeon expert, Dr. Weil. Weil testified that he reviewed Imamovic's medical records and examined her. His opined that Imamovic's neck problems seen on her x-rays were degenerative in nature and not caused by the July 2001 vehicle accident. Weil found significant the absence of any mention of radiating symptoms in her arms until Imamovic saw Berliner. This is because, if there were neurological injuries resulting from a traumatic injury, those would be expected to manifest themselves

8

"immediately or shortly after" the event. He opined that she may have suffered some soft tissue symptoms as a result of the accident, which would be appropriately treated with some physical therapy and muscle relaxants. He saw no evidence, however, of a permanent or sustained structural or neurological injury.[2] Weil also opined that nothing in the MRI or his examination of Imamovic objectively supported her complaints of numbness or tingling in her extremities. He disagreed with Berliner's assessment that she needed surgery.

### Dr. Richard Harding

Dr. Harding testified as a biomechanical causation expert.[3] He relied upon photographs of the wrecked Prius, the vehicle repair estimate, the accident report, the various physicians' depositions, and Imamovic's medical records. He testified that comparing the damage to the Prius with studies by the Insurance Institute for Highway Safety reflect that this collision had a Delta V of less than 8 miles per hour. Delta V signifies the change in velocity and acceleration. Harding explained that a Delta V of 8 miles an hour indicates that a rear-ended stationary vehicle "has moved from zero miles an hour to 8 miles an hour because of the crash." He

---

[2] He also opined that, to the extent that any abnormality seen on her imaging test was the result of an injury, it would more likely be caused by her prior falls than by an automobile accident.

[3] Biomechanics is the study of force and acceleration on human tissue.

testified that any neck injury from a less than 8 Delta V "would be a soft tissue injury and it would resolve within days at the most."

## B. Evidence on Damages

No bills from Kelsey-Seybold were introduced at trial. Records from Focus Physical Therapy ($2,385), Memorial MRI ($4,400), and Berlinger ($7,906.40) reflected a total of $14,691.40 in pre-trial medical expenses. Imamovic testified that she had not personally paid these expenses, but that they would be payable out of any award. Berlinger estimated future medical expenses to be $81,000.00. Imamovic also requested awards of $45,000.00 for past pain and suffering, $100,000.00 for future pain and suffering, $50,000.00 for future lost wages, and $25,000.00 for future physical impairment.

## C. The jury's verdict and the trial court's judgment

The jury did not award any damages to Imamovic in response to the following question:

> What sum of money, if paid now in cash, would fairly and reasonably compensate Maribel Imamovic for her injuries, if any, that resulted from the occurrence in question?
>
> Consider the elements of damages listed below and none other. Consider each element separately. Do not include damages for one element in any other element. Do not include interest on any amount of damages you find.
>
> Do not include any amount for any condition existing before the occurrence in question, except to the extent, if any, that such other

10

condition was aggravated by any injuries that resulted for the occurrence in question.

Answer in dollars and cents, if any.

| | | |
|---|---|---|
| a. | Physical pain and mental anguish in the past. | $0.00 |
| b. | Physical pain and mental anguish in the future. | $0.00 |
| c. | Loss of earning capacity in the future. | $0.00 |
| d. | Physical impairment in the past. | $0.00 |
| e. | Physical impairment in the future. | $0.00 |
| f. | Medical care in the past. | $0.00 |
| g. | Medical care in the future. | $0.00 |

The trial court entered a take-nothing judgment on the jury's verdict. Imamovic filed a motion for new trial arguing that the jury's failure to award damages was against the great weight of the evidence and manifestly unjust. The trial court overruled the motion for new trial, and Imamovic timely appealed.

## ISSUE ON APPEAL

In a single issue, Imamovic argues that "the jury's award of 'zero' damages, and the Court's entry of a take nothing judgment was against the great weight and preponderance of the evidence."

## STANDARD OF REVIEW

"When a party attacks the factual sufficiency of an adverse finding on an issue on which she has the burden of proof, she must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence."

11

*Benavente v. Granger*, 312 S.W.3d 745, 748 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (quoting *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001)). In reviewing a challenge that a finding is against the great weight and preponderance of the evidence, we consider and weigh all of the evidence and may set aside the verdict only if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). A jury may believe one witness and disbelieve another, and it may resolve inconsistencies in any witness's testimony. *Eberle v. Adams*, 73 S.W.3d 322, 327 (Tex. App.—Houston [1st Dist.] 2001, pet. denied).

## ANALYSIS

Imamovic argues that the "zero damages" rule applies here, which she asserts mandates reversal of the trial court's judgment because she introduced evidence of an objective injury and proved damages flowing from the injury. *See, e.g.*, *Russell v. Hankerson*, 771 S.W.2d 650, 653 (Tex. App.—Corpus Christi 1989, writ denied) ("A jury is not at liberty to disregard the evidence that an injury has occurred and award no damages."). Appellees disagree, arguing that the zero damages rule "does not apply in this case [because] Imamovic's injuries were subjective and controverted." They contend that the jury was not required to believe Imamovic's claim of injury from the accident, especially given her impeachment at trial "on several issues, including her previous medical history,

12

multiple accident history, and inconsistent treatment and complaints for her alleged injuries."  We agree with appellees that the jury's failure to award damages is not against the great weight and preponderance of the evidence.

"The general rule is that a finding of the jury is entitled to great deference by the appellate court unless the record reflects that the jury is motivated by passion, prejudice or something other than conscientious conviction." *Lehmann v. Wieghat*, 917 S.W.2d 379, 385 (Tex. App.—Houston [14th Dist.] 1996, writ denied).  A jury finding cannot be set aside on appeal merely because this Court would have weighed the evidence differently or reached another conclusion, but only if it is so against the great weight and preponderance of the evidence as to be manifestly wrong and unjust. *See  Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651 (Tex. 1988).

Imamovic cites nine cases in support of her argument that the jury's awarding her zero damages was against the great weight and preponderance of the evidence. *See Davis v. Davison*, 905 S.W.2d 789, 791 (Tex. App.—Beaumont 1995, no writ) (jury's awarding zero damages for past medical bills, past mental anguish, and past physical pain was against great weight and preponderance of evidence because plaintiff's burns were objective and documented by medical records); *Monroe v. Grider*, 884 S.W.2d 811, 820 (Tex. App.—Dallas 1994, writ denied) (jury's awarding zero damages for past pain and suffering was against

13

great weight and preponderance of evidence, given objective nature of appellant's injuries, which included fractured wrist); *Prescott v. Kroger Co.*, 877 S.W.2d 373, 375–76 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (jury's award of zero damages for past pain and suffering was against great weight and preponderance of evidence given uncontroverted evidence that appellant's injuries required surgery that was undertaken before trial); *Hicks v. Ricardo*, 834 S.W.2d 587, 590–91 (Tex. App.—Houston [1st Dist.] 1992, no writ) (jury's awarding zero damages for future pain and mental anguish was against great weight and preponderance of evidence given uncontroverted evidence of an objective injury, i.e., broken teeth and gum infections caused by faulty bridge, that still existed at time of trial); *Hammett v. Zimmerman*, 804 S.W.2d 663, 668 (Tex. App.—Fort Worth 1991, no writ) (jury's awarding zero damages for past pain and physical disfigurement to plaintiff with objective symptoms of injury was against great weight and preponderance of the evidence, but jury's awarding zero past pain and physical disfigurement to another plaintiff involved in the same automobile accident was not against great weight and preponderance of the evidence because "record reflects that she presented no objective evidence of injury"); *Russell*, 771 S.W.2d at 653 (jury's award of zero damages for past pain, mental anguish, physical impairment and medical expenses was against great weight and preponderance of evidence given jury's finding defendant at fault in car accident, plaintiff's clear "objective symptoms of injury,"

and lack of evidence "to controvert the evidence that [plaintiff] was injured in the collision and that she suffered pain and some physical impairment prior to trial"); *Cornelison v. Aggregate Haulers, Inc.*, 777 S.W.2d 542, 548–49 (Tex. App.—Fort Worth 1989, writ denied) (jury's awarding zero damages to parents for the death of son was against great weight and preponderance of evidence given uncontroverted evidence that parents were very close to son and "his death resulted in emotional distress, pain, and anguish to his parents"); *Robinson v. Minick*, 755 S.W.2d 890, 891 (Tex. App.—Houston [1st Dist.] 1988, writ denied) (jury's award of zero damages for past physical impairment was against great weight and preponderance of evidence, given objective nature of the injuries that included "multiple facial fractures that required 12 hours of surgery and approximately a month of hospitalization"); *Porter v. Gen. Tel. Co.*, 736 S.W.2d 204, 205 (Tex. App.—Corpus Christi 1987, no writ) (jury's awarding zero damages for past pain was against great weight and preponderance of evidence because there was evidence of objective injury, i.e., lacerations on appellant's arm, and no evidence "to controvert the evidence that appellant was cut in the collision").

Here, although appellees admitted fault in the July 2011 automobile collision, the jury heard ample evidence casting doubt on Imamovic's credibility, as well as evidence from which the jury could conclude either that Imamovic's back was not injured or, alternatively, that any injury was caused by earlier or later

15

incidents about which she was not forthright. "Even if the defendant's liability has been established, proof of [a] causal nexus is necessary to ascertain the amount of damages to which the plaintiff is entitled." *Walker v. Ricks*, 101 S.W.3d 740, 747 (Tex. App.—Corpus Christi 2003, no writ). The jury is not bound by expert testimony about the cause or extent of a plaintiff's subjective injuries, even when the expert's testimony is uncontroverted. *Id*. at 746–48 (evidence from which "the jury could reasonably inferred that [plaintiff] was not injured in the accident or that any problems she complained of were pre-existing" supported jury's award of zero past medical expenses); *see also Ponce v. Sandoval*, 68 S.W.3d 799, 806–07 (Tex. App.—Amarillo, 2001, no pet.) ("A jury generally may disregard a doctor's testimony on both the necessity of treatment and on the causation relationship between the accident and the plaintiff's complaints").

The cases Imamovic relies upon are distinguishable because, unlike here, in each of those cases the plaintiff suffered objective injuries, and the causal link between the defendant's conduct and the objective injury was established. Because the jury's awarding zero damages to Imamovic is not against the great weight and preponderance of the evidence, we overrule Imamovic's sole point of error.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Bland and Huddle.